IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02523-NYW

STEVEN A. WEAVER,

　　　　Plaintiff,

v.

CAROLYN W. COLVIN,

　　　　Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

This civil action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Acting Commissioner of Social Security's final decision denying the application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") of Plaintiff Steven Weaver ("Plaintiff" or "Mr. Weaver"). Pursuant to the Order of Reference dated April 5, 2016 [#22], this civil action was referred to the Magistrate Judge for a decision on the merits. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. The court has carefully considered the Complaint filed November 17, 2015 [#1], Plaintiff's Opening Brief filed February 29, 2016 [#17], Defendant's Response Brief filed March 21, 2016 [#18], Plaintiff's Reply Brief filed April 4, 2016 [#21], the entire case file, the administrative record, and applicable case law. For the following reasons, I respectfully AFFIRM the Commissioner's decision.

## PROCEDURAL HISTORY

On June 26, 2012, Mr. Weaver filed a Title II application for DIB and a protective Title XVI application for SSI. *See* [#13-4 at 232-233].[1] Mr. Weaver finished high school and has four years of a college education and a Master's degree. [#13-4 at 240; #13-3 at 218]. He alleged in the application that he became disabled on December 14, 2007, and suffers from a variety of physical and mental impairments. Plaintiff's arguments on appeal center around his coronary artery disease, a fracture sustained to his right arm, and his mental impairments. [#13-2 at 47; #17 at 47-56]. He was forty-five years old at the date of onset. Administrative Law Judge Jennifer Simmons ("ALJ") denied Mr. Weaver's application after three administrative hearings held November 7, 2013, December 19, 2013, and January 14, 2014; Plaintiff was represented by counsel at each hearing. [#13-2 at 41-67; #13-3 at 92, 173].

The ALJ continued the first administrative hearing, held November 7, 2013, to allow Mr. Weaver to obtain the testimony of two medical experts. [#13-2 at 44]. Medical expert Howard McClure, M.D., testified at the second hearing, held December 19, 2013. [*Id.*] Medical expert Robert Pelc, Ph.D. testified at the third hearing, held January 14, 2014. [*Id.*] Jammie C. Massey, a vocational expert ("VE"), also testified at the January 2014 hearing. [*Id.*] The ALJ then reviewed additional evidence Plaintiff submitted after the final hearing, before issuing her written decision. [*Id.*]

On November 7, 2013, Mr. Weaver testified he had not worked since 2007. [#13-2 at 74]. However, he also testified that in 2011 he engaged in volunteer work for Temporary Assistance for Needy Families ("TANF"); he lost TANF funds when his duties changed such that he could not perform them. [*Id.* at 76; #17 at 7]. Also, between August 2012 and October

---

[1] The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number and the page number of the Administrative Record, where applicable.

2012, Plaintiff was involved in a desalination business and was "bidding a project in Mexico," "following up with [potential investors]," but testified that "[i]t was a brief thing, just one day," and the business closed. [#13-2 at 75-76]. The ALJ asked Mr. Weaver about several medical reports that referenced his work or attempts to work during 2012. The first was a March 2012 treatment note in which his treating physician, Tillman Farley, M.D., noted that Plaintiff reported working 20 to 32 hours in a week. Plaintiff asserted that Dr. Farley must have misunderstood him, and that in actuality he "may have worked 20 to 32 hours that month." [*Id.* at 77-78]. The second was a January 2013 consultative exam authored by Kristin Helvig, Ph.D., a doctor to whom Social Security had referred Plaintiff, who noted Plaintiff "tried to do different jobs last year," and worked a sales commission job that he quit after three months. [*Id.* at 80]. Plaintiff represented that he did not remember that exam and had not participated in any such job. [*Id.* at 81-82]. The third was a May 2013 assessment that recorded Plaintiff's complaint that he had hurt his shoulder at work. [*Id.* at 82; #13-3 at 130-131]. Lastly, the ALJ asked Plaintiff about a July 2012 report that noted Plaintiff was working in landscaping and fencing outside. Plaintiff testified that he never engaged in any physical labor, he ran errands occasionally for his landlady, and that any comments to his doctors to the contrary were simply his effort to appear "upbeat." [#13-2 at 83-84; #13-3 at 131]. Mr. Weaver also testified that he had looked for work "[a]ll the time" in the previous two years, mainly "[c]onsulting" and "[w]hatever is there." [#13-2 at 85]. Finally, Plaintiff testified that he had driven himself and his daughter to California in 2011. The drive took four days and he drove "[n]o more than ten [hours]" a day. [*Id.* at 84-85]. They lived in California from the first of September to the first of November 2011. [*Id.* at 84]. The ALJ continued the hearing to allow Plaintiff to retrieve medical records from his cardiologist. [*Id.* at 86-87].

During the reconvened hearing on December 19, 2013, Dr. McClure testified as an objective medical examiner as to Plaintiff's physical impairments.  He testified that, according to his review of the medical evidence and in his opinion, Plaintiff's impairments did not meet or medically equal any listing, but specifically did not meet the listings at 4.04, 1.04 and 1.02. [#13-3 at 99-100].  Dr. McClure also testified that in his opinion a "full light RFC" was appropriate to accommodate Plaintiff's physical impairments.  [*Id.* at 100].  Mr. Weaver's attorney objected to Dr. McClure's testimony on the basis that it was incomplete, and he asked the ALJ not to attribute any weight to the testimony.  [*Id.* at 101].

Also during this hearing, Plaintiff testified as to his work background.  He described himself as an entrepreneur who specialized in constructing aquariums and who did not have much experience with supervisors, and stated that in 2007 he was a chief executive officer who was "on top of the world."  [#13-3 at 137-138].  His was a contract position and he was paid "based on the investment in the company"; his investors stopped investing toward the end of the year and he lost the position in December 2007.  [*Id.* at 140-141].  He testified that during this time he had received other offers to work in his field but they required him to live in and relocate his family to Dubai, UAE, which he was unwilling to do.  [*Id.* at 141].

Plaintiff also testified that he deteriorated psychologically in 2008, when he began experiencing anxiety and panic attacks.  [#13-3 at 142].  He stated he spent "most of [his] days on the phone with trying to find new investors in the company, and the technology that we had to try to get it back going."  [#13-3 at 134-136, 144].  The attacks were exacerbated by his wife's suicide in 2010.  [*Id.* at 136, 189].  He testified that he has since "lost everything" and is homeless; he lives in a camper without heat that he must move periodically because he cannot afford to rent space at a trailer park.  [*Id.* at 144].  Plaintiff testified that multiple stressors,

including no regular residence, cause his attacks, and that he had and continues to have trouble interacting with people as a result of those stressors. [*Id.* at 137]. He testified that he feels out of control every day. [*Id.* at 167]. His teenage daughter was not living with him at the time of the hearing, but rather living with family friends. [*Id.* at 157].

Mr. Weaver's attorney also examined him with regard to physical ailments. First, they discussed Mr. Weaver's right elbow, which he injured when his truck ran over it in June 2012. [#13-3 at 145]. Plaintiff testified that, by way of example, he now cannot shake a person's hand, open a door knob, or open a can of cat food without the sensation of his elbow popping and his arm giving out, which he described as very painful. [*Id.* at 145-146]. Mr. Weaver also spoke about pain in his back, shoulders, ankles, and knees, which he described as "old stuff," for which he takes morphine. [*Id.* at 146]. However, he stated, morphine fails to alleviate the pain and it causes him anger and depression as side effects. [*Id.*] He rolls his ankle frequently, and he testified that "[t]wo toes are almost always numb," and if he walks two blocks his "whole foot is numb." [*Id.* at 165]. He also experiences chest pains with every panic attack, which he referred to as "stress-induced angina." [*Id.* at 165-166].

The hearing was reconvened a final time on January 14, 2014, at which time Dr. Pelc testified as an objective medical examiner as to Plaintiff's mental impairments. *See* [#13-3 at 173]. In response to Dr. Pelc's question whether Plaintiff was currently taking any psychological medication, Plaintiff testified that he was taking Trazodone to help him sleep and Clonazepam. [*Id.* at 181]. Dr. Pelc testified that he reviewed documentation regarding three conditions "from a psychological perspective": a depressive disorder or bereavement problem, classified as an affective disorder under 12.04; a post-traumatic stress or anxiety not otherwise specified disorder, classified as an anxiety-related disorder under 12.06; and a personality disorder not

otherwise specified under 12.08. [*Id.* at 182-183]. In Dr. Pelc's opinion, Plaintiff's conditions did not meet or equal the psychological listings regarding the B or C variable, [*id.* at 183-188], and that he "was capable of performing tasks that were at least detailed tasks, and that he could have occasional to frequent contact with others." [*Id.* at 190].

The VE also testified during this hearing. The ALJ queried whether a person of Plaintiff's age and level of education could perform Plaintiff's previous work positions taking into consideration the following limitations: lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; climb ramps and stairs frequently; stoop, kneel, crouch, or crawl frequently; climb ladders, ropes, or scaffolds occasionally; and interact with others, including coworkers, supervisors, and the public, only occasionally. [#13-3 at 218]. The individual was assigned no limitations with respect to balance, exposure to hazards, heights, or dangerous machinery, extreme temperatures, or the ability to understand, remember, and carry out detailed instructions. [*Id.*] The VE testified that such a person could not perform in Plaintiff's previous positions because of the limitation of only occasional interaction with others. [*Id.*] However, in response to the ALJ's question whether such an individual could perform other work, the VE provided three examples: hand packager, kitchen helper, and industrial cleaner. [*Id.* at 219]. The ALJ then asked whether such an individual could perform work if further limited to lifting and carrying twenty pounds occasionally and ten pounds frequently. The VE responded that this person could work as a housekeeper, routing clerk, or production assembler. [*Id.*] The ALJ posed a third hypothetical, in which the individual has no exertional limitations, has "the ability to understand, remember and carry out simple, routine tasks," but has no interaction with the public and only occasional, superficial interactions with coworkers and supervisors. [*Id.* at 219-

220].  The VE responded that no such work exists.  As hypothetical four, the ALJ asked whether an individual who is "off task 20 percent of the workday, in addition to normal breaks" could perform Plaintiff's previous positions.  The VE responded such a person could not.  [*Id.* at 220].  Finally, the ALJ asked whether an individual who missed two days of work a month could perform any of Plaintiff's previous positions, and the VE answered in the negative.  [*Id.*]  Plaintiff's attorney also asked the VE a series of questions and ultimately objected to her testimony regarding other jobs available to Plaintiff on the basis that he could not verify her response.  *See* [*id.* at 230].  The three hearings lasted a combined four hours and forty minutes. *See* [#17 at 6].

Plaintiff subsequently submitted additional evidence, which the ALJ considered in rendering her decision.  [#13-2 at 44].  The ALJ issued her written decision on April 11, 2014, concluding that Mr. Weaver was not disabled.  [#13-2 at 43-67].  Plaintiff requested a review of the ALJ's decision, which the Appeals Counsel denied on September 23, 2015.  [#13-2 at 1].  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on November 17, 2015.  This court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question

instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### A. Mr. Weaver's Challenge to the ALJ's Decision

An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). Supplemental Security Income is available to an individual who is

financially eligible, files an application for SSI, and is disabled as defined in the Act.  42 U.S.C. § 1382.  An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).  Additionally, the claimant must prove he was disabled prior to his date last insured.  *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.  20 C.F.R. § 404.1520(a)(4)(v).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.  Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*  Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 404.1520(e).  If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.  *Williams*, 844 F.2d at 750.  Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d).  *Id.*  At step four of the evaluation

process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751.  The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th Cir. 2015) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (internal quotation marks omitted)).  "The claimant bears the burden of proof through step four of the analysis." *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience.[2] *Neilson*, 992 F.2d at 1120.  The Commissioner can meet his or her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir. 1999).

The ALJ first determined that Mr. Weaver was insured for DBI through June 30, 2009. [#13-2 at 47].  She concluded that he must establish disability before June 30, 2009 to be eligible

---

[2] "A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's 'RFC category,' the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). *Williams*, 844 F.2d at 751-52.  However, if a claimant suffers from both exertional and nonexertional limitations, the decision maker must also consider "all relevant facts to determine whether the claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations." *Id.*

for DBI, and must establish disability on or after June 26, 2012 to be eligible for SSI.[3]  [*Id.* at

44].  Next, following the five-step evaluation process, the ALJ determined that Mr. Weaver: (1)

had not engaged in substantial gainful activity since December 14, 2007; (2) had severe

impairments of "depression, anxiety/post-traumatic stress disorder, personality disorder, chronic

pain (of unknown area), degenerative disc disease L4-5 and L5-S1, obesity, popliteal lesion in

the right lower extremity, and tobacco abuse"; and (3) did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d),

416.920(d)).  [#13-2 at 47-49].  At step four, the ALJ found that Plaintiff had an RFC to perform

light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  The ALJ specified as

follows:

> [H]e is limited to lifting/carrying 20 pounds occasionally and 10 pounds
> frequently, standing/walking 6 hours in an 8-hour workday, and sitting 6 hours in
> an 8-hour workday.  He has no limitations in balancing, can perform frequent
> stooping, kneeling, crouching, crawling, and climbing ramps and stairs; and
> occasional climbing on ladders, ropes and scaffolds.  He must avoid concentrated
> exposure to unprotected heights, dangerous machinery, extreme heat and extreme
> cold.  Mentally, the claimant remains able to understand, remember, and carry out
> detailed instructions, and can tolerate occasional work interactions with
> supervisors, coworkers and the public.

[#13-2 at 50].  The ALJ determined, after reviewing the medical evidence, that Plaintiff's

medically determinable impairments could reasonably be expected to cause the alleged

symptoms, but that his statements regarding the intensity, persistence, and limiting effects of the

symptoms were not "fully persuasive" considering "his activities of daily living, his very

frequent job searching and applying, his intermittent work activity, his driving to California for a

---

[3] SSI is not payable until the month after the application is filed, *see* 20 C.F.R. §§ 416.200,
416.202(g), and the earliest DIB is payable is twelve months prior to the application date.  *See* 20
C.F.R. § 404.315(a)(4).

job, and his telling his providers he is trying to get on disability despite his job activities." [*Id.* at 59].

The ALJ then relied on the VE's testimony that none of Plaintiff's past relevant work fell within his RFC "because the interactive demands of these jobs exceed the claimant's current [RFC] for occasional work interaction with others," and concluded that Mr. Weaver is unable to perform past relevant work.  [#13-2 at 66].  However, in "[c]onsidering the claimant's age, education, work experience, and residual functional capacity," the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." [*Id.*]  Accordingly, the ALJ concluded that Plaintiff was not disabled

Mr. Weaver now argues that the ALJ erred for the following reasons.  First, he contends that the ALJ's finding that his coronary artery disease is not a severe impairment is not based on substantial evidence.  [#17].  Second, he asserts the ALJ erred in evaluating the weight to be attributed to the opinion evidence, including her consideration of "the relevant factors set forth in the rules."  [*Id.*]  Third, he argues the ALJ erred in finding that his right elbow impairment did not meet the durational test for a severe impairment.  [*Id.*]  Finally, he contends the ALJ's findings and RFC relating to his mental impairment are not based on substantial evidence.  [*Id.*]

**B.      ALJ's Consideration of Severe Impairments**

Mr. Weaver argues the ALJ erred at step two in failing to list his coronary artery disease and right elbow impairment as severe.  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have only a minimal effect on an individual's ability to work.  20

C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 416.921.  Unless an impairment is expected to result in death, an ALJ will consider the impairment only if lasts twelve consecutive months.  *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).  For the reasons discussed below, I find the ALJ's conclusions regarding Plaintiff's coronary artery disease and right elbow impairment are supported by substantial evidence in the record.

###### 1.   Coronary Artery Disease

Plaintiff argues that in finding at step two that his coronary artery disease was a medically determinable impairment, the ALJ then erred in concluding that the impairment was not severe.  [#17 at 47].  Plaintiff contends "the record is replete with evidence that [his] cardiac impairment, particularly his exertion and anxiety triggered angina, caused him to be unable to perform daily activities and by extension work activities."  [*Id.*]  Plaintiff suggests the ALJ conflated the analysis of this condition with her assessment of his anxiety, due to her finding that the angina was often triggered by anxiety, and argues that the ALJ failed to consider that his anxiety causes two sets of symptoms, one mental and one physical.  [*Id.* at 48-49].  As a result, Plaintiff asserts, the ALJ failed at step two to adequately consider and address the physical symptoms that result from the combination of his anxiety disorder and coronary artery disease when she determined that his coronary artery disease is not severe.  Defendant responds that the ALJ reasonably found Plaintiff's coronary artery disease not severe because it did not impose any exertional limitations.  [#18 at 12].

In considering Plaintiff's coronary artery disease at step two, the ALJ found that the "occluded artery has collateralized such that he has few or no angina symptoms but rather anxiety symptoms," and she noted Dr. McClure's testimony that "the lung nodule seen on imaging does not affect breathing."  [#13-2 at 47].  The ALJ concluded that the coronary artery

disease and associated issues were non-severe because "there is no evidence that they have had more than a minimal effect on the claimant's ability to do basic activities." [*Id.*] The ALJ noted that, upon finding an impairment that could reasonably be expected to produce Plaintiff's symptoms, she must make a finding on the credibility of Plaintiff's statements in consideration of the entire record to determine the extent to which the symptoms limit Plaintiff's functioning. [#13-2 at 51]. Once she concluded that the coronary artery disease was a medically determinable impairment, the ALJ considered Plaintiff's testimony and how it comported with the following medical evidence.

During a February 2009 visit with his treating cardiologist, Kern Buckner, M.D., Plaintiff reported feeling well up until October 2008, when he had begun to experience intermittent chest discomfort associated with stress. [#13-9 at 557-559]. However, chest exams in December 2008 and January 2009 reflect no mention of chest pain weakness. [#13-12 at 1029-1032]. Plaintiff reported feeling weak and sweaty to Dr. Buckner, but reported no exertional discomfort. [#13-9 at 557]. His femoral arteries and pedal pulses were full and symmetrical, and he denied dyspnea, orthopnea, and edema. [*Id.* at 558]. Dr. Buckner opined that Plaintiff's symptoms were more likely a result of excess weight than cardiac related, but ordered an adenosine stress Cardiolite study to be certain. He noted, "[i]f the study is negative for reversible ischemia, I think we can assume [Plaintiff's] symptoms are noncoronary and pursue other etiologies. If on the other hand, there is evidence of reversible ischemia or the scan is indeterminate, I would recommend coronary artery imagining." [*Id.*] The Cardiolite stress test was administered March 3, 2009, and showed normal sinus rhythm and minor ST elevation. [*Id.* at 561-563]. A resting EKG showed a normal sinus rhythm and an EKG following exercise did not reveal any indication of ischemia. [*Id.* at 579]. Plaintiff's post stress myocardial perfusion was normal. The reviewing

doctors concluded that Plaintiff's left ventricular systolic function, right ventricle, regional wall motion, and myocardial perfusion at rest were all normal and there was no evidence of myocardial ischemia. [*Id.* at 580].

During a follow up appointment in August 2009, Dr. Buckner reported that Plaintiff "has done well and has had no cardiovascular symptoms such as angina, heart failure or syncope." [#13-9 at 551]. Dr. Buckner wrote that Plaintiff "has become fully active" and complains only of heat intolerance; specifically, Plaintiff felt hot and fatigued while weeding in his garden. [*Id.*] Plaintiff told Dr. Buckner that, overall, he thought his exercise tolerance had improved. [*Id.*] Dr. Buckner opined that Plaintiff's rapid heartbeat and heat intolerance were a result of his weight rather than issues with his heart, and diagnosed Plaintiff with uncompromised functional class I angina corroborated by a negative adenosine stress Cardiolite study taken in March 2009. [*Id.* at 552]. In May 2010, a ramped Bruce protocol stress test demonstrated a normal heart rate response, normal blood pressure, and fair adjusted exercise capacity. [*Id.* at 545]. Plaintiff reported at that time that he "continues to exercise regularly and has no chest discomfort"; the doctor recorded that Plaintiff "has had no signs or symptoms of heart failure nor has he had syncope." [*Id.* at 546]. Plaintiff cites these same records to argue he "reported to and/or sought treatment from medical providers for anxiety or exercise triggered angina that interfered with his activities." [#17 at 48]. I conclude that the ALJ's interpretation of the records is reasonable and supported.[4]

---

[4] Plaintiff cites a medical report from April 14, 2010, in which Dr. Buckner described Plaintiff as having marital difficulties with his wife "given their financial situation," and reported that, from a cardiovascular perspective, Plaintiff was doing well "until a recent stress of his marital situation [] caused him significant anxiety." [#13-9 at 548]. Dr. Buckner wrote that Plaintiff developed "substernal chest discomfort with left arm radiation that responded to three sublingual nitroglycerin." [*Id.*] However, Dr. Buckner also described the incident as isolated, and observed that Plaintiff "has experienced no significant acceleration of symptoms, such as increasing

Plaintiff's wife died in 2010, and by 2011 the cardiologist opined that Plaintiff's chest discomfort was caused by anxiety and not angina.  [#13-9 at 541].  Dr. Buckner specifically noted that the chest discomfort of which Plaintiff complained "is aggravated more by emotional stress, especially family stress," and "is not necessarily associated with exertion."  [*Id.*]  In July 2011, in response to Plaintiff's complaint of chest pain, Dr. Buckner opined that anxiety was the cause and noted Plaintiff was doing well from a cardiovascular standpoint "without exertional limitation due to dyspnea or fatigue or chest discomfort."  [*Id.* at 541-543].  On December 21, 2011, Plaintiff underwent an uncomplicated left heart catheterization that showed the severe single vessel coronary artery disease with chronic total occlusion of the proximal right coronary artery with reconstitution of the distal right coronary artery by left-to-right collaterals.  [*Id.* at 537-538, 575].  There was evidence of nonobstructive coronary artery atherosclerosis in the left circumflex artery and left anterior descending artery, but no evidence of other significant obstructive lesions.  [*Id.* at 575].  Overall, Plaintiff's left ventricular systolic function was normal.  At that time, Dr. Buckner observed, "[s]ymptomatically, [Plaintiff] still exerts without significant limitation due to dyspnea or fatigue."  [*Id.* at 538].  As of February 19, 2014, Dr. Farley observed that Plaintiff has no signs or symptoms of heart failure and has no exertional angina or exertional intolerance due to dyspnea or fatigue, and exercises 90 to 120 minutes a week, "primarily walking."  [#13-13 at 1083-1084].

The court's review of the ALJ's step two determination is limited to whether she applied the correct legal standard and whether it is supported by substantial evidence that a reasonable

---

frequency or severity," and has had no "resting episodes unrelated to stress."  [*Id.*]  Plaintiff also cites a medical record from August 2012, in which a nurse practitioner wrote, "I spoke to Mr. Weaver on the phone who truly has lifestyle-limiting claudication symptoms, even though he can walk fairly well."  [#13-11 at 773].  This statement is unsubstantiated, and is not supported by any of the other medical evidence in the record.

mind might accept to support the conclusion. *Hargis v. Sullivan,* 945 F.2d 1482, 1486 (10th Cir. 1991). Plaintiff concedes the ALJ applied the correct legal standard. *See* [#17 at 47]. As to substantial evidence, while the Tenth Circuit considers the necessary showing to be "*de minimis,*" a claimant "must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). *See also Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (diagnosis of a condition, alone, does not establish disability). Plaintiff bears the burden of demonstrating that his condition significantly limits his daily activities.

The ALJ provided a detailed discussion of and specific cites to the record to support her finding that Plaintiff's coronary artery disease resulted in minimal or no impact on his daily activities, *see, e.g.,* [#13-2 at 56-57], and I respectfully disagree with Plaintiff that the ALJ "dismiss[ed] the angina caused by [his] coronary heart disease because it was often triggered by anxiety." [#17 at 48]. Rather, I read her decision as simply concluding that Plaintiff's coronary artery disease does not significantly limit his activities, regardless of the cause of the angina or the fact that the chest discomfort is preceded or accompanied by anxiety. *See, e.g.,* [#13-2 at 57]. The record indicates that in a span of six years, Plaintiff's activities were interrupted twice as a result of anxiety-induced chest pain. *See* [#13-9 at 548; #13-12 at 961]. While another ALJ may have considered this sufficient to find a severe impairment, I find the record equally supports a conclusion to the contrary, and I cannot reweigh the evidence and will not substitute my judgment for that of the Commissioner. *Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005); *Hargis*, 945 F.2d at 1486-87 (citations omitted). Furthermore, even if the ALJ erred in failing to consider the combined effect of all of Plaintiff's impairments at step two, the error is harmless because the ALJ found that other impairments were severe and thus she did not conclusively deny benefits at that step. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir.

2008) (holding ALJ's failure to treat an impairment as severe at step two was harmless error because ALJ proceeded with the evaluation sequence).  *See also Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008) ("Once the ALJ finds that the claimant has *any* severe impairment, he has satisfied the analysis for purposes of step two. His failure to find that additional alleged impairments are also severe is not in itself cause for reversal") (emphasis in original) (citations omitted).  Of course, the ALJ was required to consider the effect of all of the medically determinable impairments, regardless of their severity, in determining Plaintiff's RFC.  *Hill*, 289 F. App'x at 292 (citing SSR 96–8P, 1996 WL 374184, at *5).  Plaintiff does not argue the ALJ failed to do this with respect to his coronary artery disease.  *See* [#17 at 47-49 (limiting argument regarding ALJ's treatment of his coronary artery disease to a step two error)].  In any event, I find the ALJ sufficiently considered the coronary artery disease at step four, as evidenced by her discussion of the coronary artery disease in explaining how she formulated Plaintiff's RFC.  I find no error in the ALJ's treatment of Plaintiff's coronary artery disease.

   2.   Right Elbow Impairment

   On June 30, 2012, Plaintiff sustained an injury to the right radial neck of his elbow that causes him severe pain and affects his ability to grip and twist items with his right hand.  The ALJ determined that this impairment is not severe because it did not meet the durational requirements of the SSA.  Plaintiff asserts this is in error.  Furthermore, Plaintiff argues, even if the ALJ did not err in her finding, she erred in failing to include the medically determinable impairment in her assessment of his RFC.  [#17 at 55]. Defendant responds that the ALJ reasonably found Plaintiff's right elbow fracture did not meet the durational requirement because it was asymptomatic in less than one year, and Plaintiff reported participating in landscaping and building fences within that time and before he suffered the second elbow injury.  [#18 at 12].

The ALJ noted Plaintiff's history of a "right radial neck disorder (elbow)" resulting from a right arm fracture in July 2012, and observed that, by May 2013, the condition produced no symptoms. [#13-2 at 47]. She also noted that in May 2013, Plaintiff's orthopedic doctor diagnosed him for the first time with olecranon bursitis of the right elbow. [*Id.* at 48]. The ALJ concluded that the issues stemming from the right arm fracture had resolved in less than twelve months such that she could not link the bursitis to the July 2012 injury, and she further concluded that the bursitis should resolve within less than twelve months of the May 2013 onset. [*Id.*] The ALJ stated she found no objective evidence in the record of disabling pain in Plaintiff's right arm, [*id.* at 52], and referred to the following evidence.

In September 2012, Plaintiff fell on his right elbow but did not seek medical attention for several weeks because he was "very busy with his business." [#13-11 at 869-872]. X-rays of his elbow ultimately showed a nondisplaced radial neck fracture that was not fully healed. [*Id.* at 872]. The treating orthopedic physician, Wade Smith, M.D., gave Plaintiff a prescription for pain medication and a hinged elbow brace on account that Plaintiff "ha[d] a lot of activities to perform." [*Id.*] An x-ray of the fracture the following month demonstrated delayed union, but one month later, in March 2013, Plaintiff reported to Dr. Smith that he forgets at times he has a fracture, [#13-11 at 870-871], and an exam showed only slight tenderness. [*Id.* at 869-870]. In May 2013, Plaintiff returned to Dr. Smith with a complaint that he had injured his elbow again "doing physical labor overhead with his right arm." [#13-11 at 894]. Dr. Smith noted that Plaintiff was "a longstanding patient with an asymptomatic radial neck nonunion." [*Id.*] Dr. Smith diagnosed olecranon bursitis secondary to overuse at work, recommended a one-week work restriction, and observed that Plaintiff could fully bend the elbow to 130 degrees out of 150. [*Id.*] Dr. Smith also commented that Plaintiff felt the one-week work restriction was

adequate, and that he was "relieved to know he did not have a major injury." [*Id.*] In addition, between May 31, 2013 and July 8, 2013, Plaintiff reported to his treating physician, Dr. Farley, that he was working outdoors on a landscaping and fencing crew and that the work had caused him pain in his right elbow. [#13-11 at 895]; *see also* [#13-12 at 1004-1006]. Dr. Farley diagnosed Plaintiff with "[o]veruse bursitis," and prescribed him Oxycodone. [#13-11 at 895]. During a follow up appointment the next month, the examining physician did not note any atrophy of Plaintiff's right upper extremity. *See* [#13-11 at 897]. Rather, the physician in Dr. Farley's office noted that Plaintiff requested a three-month refill of "MS contin, oxycodone, trazadone, and clonazepam," because he "[h]as a job in Cabo." [*Id.*] Finally, the ALJ observed that when questioned at the hearings about his reports of landscaping and fencing and other general work, Plaintiff responded that Dr. Farley misunderstood him and he denied telling Dr. Smith he was working. [#13-2 at 54]. The ALJ stated that the "inconsistencies throughout the record and [Plaintiff's] testimony tend to diminish the persuasiveness of his alleged limitations."[5] [*Id.*] *See also* [#13-2 at 53-54, 58]. I find that the ALJ's decision regarding the severity of Plaintiff's right elbow impairment is supported by the record.

I next consider Plaintiff's argument that the ALJ was required to consider the right elbow impairment in assessing Plaintiff's RFC. As noted above with respect to Plaintiff's coronary artery disease, the governing regulations require an ALJ in assessing the RFC to consider "the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe.*" *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) (emphasis in original). *See also Mushero v. Astrue*, 384 F. App'x 693, 695 (10th Cir. 2010) ("Testimony elicited by hypothetical questions that do not relate with

---

[5] The court notes that Plaintiff does not raise the ALJ's assessment of his credibility on appeal.

precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.") (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991)). Also, the ALJ may not "simply rely on his finding of non-severity as a substitute for a proper RFC analysis." *Wells*, 727 F.3d at 1065 (citation omitted). The ALJ must include in her RFC assessment "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts...and nonmedical evidence." *Id.*

I find that the ALJ satisfied these requirements. After determining at step two that the right elbow condition was a medically determinable impairment, *see* [#13-2 at 47-48], she engaged in a lengthy and detailed discussion at step four of both the medical evidence supplied by Plaintiff and of Plaintiff's testimony during the three hearings. *See* [#13-2 at 50-66]. She specifically discussed the medical records of his right elbow pain and his testimony that contradicted in part those records. *See* [*id.* at 53, 58]. Following her summary of the right elbow impairment and the other medically determinable impairments, the ALJ wrote that these impairments "could reasonably be expected to cause the alleged symptoms." [*Id.* at 59]. She found, however, that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" were not fully persuasive in light of Plaintiff's "activities of daily living, his very frequent job searching and applying, his intermittent work activity, his driving to California for a job, and his telling his providers he is trying to get on disability despite his job activities." [*Id.*] In addition, the ALJ stated at step four that she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [*Id.* at 50]. This court concludes that the ALJ's analysis was sufficient. *See Bales v. Colvin*, 576 F. App'x 792, 799 (10th Cir. 2014) (finding no error with ALJ's step four assessment where ALJ "thoroughly discussed the medical evidence,"

and where there was "no indication that, despite not expressly mentioning [claimant's] other medical problems, the ALJ did not take them into account."). *See also Hill*, 289 F. App'x at 292-93 ("We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [he] can determine RFC within that category'") (citation omitted). The ALJ considered the impairment caused by the injury to Plaintiff's right elbow and did not find that Plaintiff's allegations of pain, discomfort, and limitation as a result of the injury were fully credible. *See Suttles v. Colvin*, 543 F. App'x 824, 826 (10th Cir. 2013) ("Taking 'common sense, not technical perfection, [a]s our guide,' … we hold that the ALJ conducted a mental RFC assessment separate from the non-severity determination made at step two.") (quoting *Keyes–Zachary v. Astrue,* 695 F.3d 1156, 1167 (10th Cir. 2012)). I find no error with respect to the ALJ's consideration of Plaintiff's right elbow.

**C.      The ALJ's Evaluation of Opinion Evidence**

Mr. Weaver argues that the ALJ erred in (1) attributing no weight to the Medical Source Statement ("MSS") prepared by Dr. Farley, his treating physician, (2) attributing less than controlling weight to the MSS prepared by Dr. Buckner, his treating cardiologist, and (3) attributing great weight to Dr. McClure, the independent medical examiner. [#17 at 49-53]. Defendant disagrees.

1.      Applicable Legal Standard

In determining disability for the purposes of SSI and DIB, the opinion of a treating source is generally entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). *See also* 20 C.F.R. § 404.1527(b), (c); *Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1161 (D. Colo. 2015). The ALJ is

required to apply the following factors when he or she declines to give the treating source's opinion controlling weight:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) (citing 20 C.F.R. § 416.927(c)(2)(i)-(ii), (c)(3)-(c)(6)). *See also* 20 C.F.R. § 404.1527(c). In all cases, an ALJ must "give good reasons in [the] notice of determination or decision" for the weight assigned to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). *See also Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing Social Security Ruling 96–2p, 1996 WL 374188, at *5; *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003)). "[I]f the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so." *Watkins*, 350 F.3d at 1300 (citations and internal quotation marks omitted).

> 2.    Application

I begin with the ALJ's treatment of Dr. Buckner's MSS, and her decision to attribute it little weight. During an October 8, 2013 visit, Dr. Buckner opined that Plaintiff's chest symptoms occurred occasionally, lasted minutes, and that stress was not a major contributor. [#13-12 at 953-956]. He further opined that emotional factors contribute to Plaintiff's subjective symptoms and functional limitations, and that he is capable of moderate stress-normal work. Dr. Buckner observed that Plaintiff can lift ten pounds occasionally, walk four blocks, and sit two hours out of eight if changing positions. [*Id.* at 954]. He also noted that Plaintiff requires unscheduled breaks and must rest 90 minutes every four hours before returning to work. [*Id.*]

Dr. Buckner opined that Plaintiff must avoid all exposure to extreme heat, cigarette smoke, fumes, odors, and gases.  [*Id.* at 955].  The ALJ gave this opinion little weight in large part because contemporaneous treatment records and examination did not support the opinion.  *See* [#13-2 at 61-62].  For instance, Plaintiff's blood pressure was normal on several occasions, a chest x-ray showed no evidence of acute cardiopulmonary disease, and the arterial collaterals were patent. He had recently received a negative diagnosis for acute coronary syndrome.  In February 2013, Dr. Buckner recorded that Plaintiff's chest discomfort and claudication were improved.  Dr. Buckner had also opined in July 2011 that Plaintiff's chest discomfort is aggravated more by emotional stress, particularly family stress, and not associated with exertion. [*Id.* at 61 (citing #13-9 at 541)].  Dr. Buckner had last seen Plaintiff in May 2013, five months prior to the MSS, and those treatment records show stable conditions with respect to Plaintiff's coronary and femoral artery, only occasional chest symptoms generally associated with anxiety, and an improvement of other symptoms.  [*Id.* at 62].  In addition, the ALJ noted that Dr. Buckner had previously opined Plaintiff's chest symptoms were anxiety rather than angina related and that emotional factors contribute to Plaintiff's subjective symptoms and functional limitations. Finally, the ALJ noted that Plaintiff smokes "at least a half a pack of cigarettes a day…and has for years." [*Id.* at 61].

With respect to Dr. Farley's MSS, the ALJ gave it no weight.  On October 28, 2013, Dr. Farley generated a MSS regarding Plaintiff's ability to engage in work-related activities.  *See* [#13-12 at 964].  Dr. Farley opined that Plaintiff could lift less than ten pounds frequently, stand and/or walk less than two hours and sit less than two hours in an eight-hour workday, must change positions every fifteen to twenty minutes, and would need to lie down during his work shift.  [*Id.*]  In the space provided for listing the medical findings that support those limitations,

Dr. Farley wrote, "see records."  [*Id.* at 965].  The ALJ rejected this opinion primarily because

Dr. Farley wrote concurrently in his treatment notes that he completed the MSS based on the

Plaintiff's "perceptions of what he is and is not able to do," and that he was "not able to conduct

testing to provide objective answers to these questions."  [#13-12 at 995]; *see also* [#13-2 at 61].

The ALJ explained that, because the MSS was based on Plaintiff's subjective complaints, the

document was "approximately as persuasive as the claimant's subjective allegations."   As

discussed above, the ALJ found that Plaintiff's statements regarding the intensity, persistence

and limiting effects of his symptoms were not fully persuasive, and Plaintiff does not challenge

the ALJ's determination of his credibility.   The ALJ also observed that Dr. Farley's treatment

records from October 2013 "reflect improvement of symptoms or intermittent exacerbations of

symptoms, often due to reported work activity."  [#13-2 at 61].  For instance, at the same visit

during which Dr. Farley completed the MSS, Plaintiff reported that his pain is stable and that he

had no new concerns or complaints.  [#13-12 at 995].[6]  Finally, the ALJ observed that the MSS

authored by Dr. Farley closely resembled the MSS authored by Dr. Buckner.  For the ALJ, the

similarities between the two opinions, considering Dr. Farley's note that he had not examined

Plaintiff, diminished the persuasiveness of Dr. Buckner's opinion.  [#13-2 at 61].

I find the ALJ provided specific reasons that satisfactorily explain her decision to

attribute little weight to Dr. Buckner's opinion and no weight to Dr. Farley's opinion regarding

Plaintiff's physical limitations. I further find that the ALJ's conclusions are supported by the

administrative record.  Plaintiff's main argument on appeal is that the ALJ listed the similarities

of Dr. Buckner and Dr. Farley's opinions as a reason for not attributing controlling weight to

---

[6] I also note that Dr. Farley reported Plaintiff asked him to complete the MSS with respect to his "back problems."  [#13-12 at 995].  Plaintiff's lumbar impairments are not at issue on this appeal.

them. However, her written decision is clear that she found that neither physician's opinion was borne out by the treatment records; further, she supplied specific citations to show that the doctors' opinions were either contradicted, or not corroborated, by their own treatment records. Finally, though Plaintiff does not raise it, I find that while the ALJ did not specifically consider each factor identified in the governing regulations, her discussion of each opinion in juxtaposition with the medical evidence was specific enough for the court to determine the weight she attributed and why. *Rivera v. Colvin*, 629 F. App'x 842, 844 (10th Cir. 2015) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1257–58 (10th Cir. 2007) (stating that the ALJ need not explicitly discuss all the factors if his decision is "sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the…medical opinion and the reasons for that weight") (internal quotation marks and citations omitted)).

With respect to Dr. McClure, the ALJ attributed great weight to his testimony on the bases that he is an expert in the relevant field, he examined the entire medical record, he explained his opinions "with reference to specific medical signs and findings" and exhibits in the record, he was "thoroughly cross-examined by Plaintiff's attorney," and "his conclusions are consistent with the objective evidence of record." [#13-2 at 61]. In sum, the ALJ found that Dr. McClure's opinion of Plaintiff's RFC was substantiated by the record and bolstered by his specific references to the record. [#13-2 at 60 (reviewing with specificity Dr. McClure's summary of Plaintiff's records)]. This is sufficient. *See Rivera*, 629 F. App'x at 844 (holding the ALJ permissibly gave one physician's opinion more weight because he found that opinion "most consistent with the record as a whole," and that the physician had reviewed the available medical records, whereas the other physician relied at least in part on plaintiff's subjective description of her symptoms, which the ALJ found unreliable). *See also Barnes v. Colvin*, 27 F.

Supp. 3d 1153, 1159 (D. Colo. 2015) (finding ALJ did not err in rejecting treating physician's opinion and giving great weight to independent medical examiner because the ALJ gave "valid, supportable reasons for his determination," in particular, that the treating physician's opinion "was inconsistent with his own treatment notes and the other evidence of record."); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").   In contesting the ALJ's allocation of weight, Plaintiff essentially asks the court to reweigh the evidence.   The court may review the sufficiency of the evidence, but not reweigh it.   *See Lax*, 489 F.3d at 1084.   I find that there was enough evidence to support the ALJ's findings.

**D.       The ALJ's Assessment of Plaintiff's Mental Impairments**

Finally, Plaintiff argues the ALJ erred in failing to design an RFC that includes limitations regarding his ability to understand, remember, and carry out detailed instruction. [#17 at 57].   Defendant responds that the ALJ's decision is consistent with the opinions of Dr. Pelc, Dr. Helvig, and the state agency psychiatric consultant, Ellen Ryan, M.D., and the medical evidence.   Defendant further responds that the ALJ reasonably considered and rejected the opinion of psychotherapist Sandra Goldhaber, LCSW, a non-acceptable medical source, who imposed greater restrictions on Plaintiff's ability to function.   [#18 at 19].

The ALJ specified in the RFC that Plaintiff can understand, remember, and carry out detailed instructions, but should be limited to only occasional work interactions with supervisors, coworkers, and the public.   [#13-2 at 50].   In formulating this part of the RFC, the ALJ considered Plaintiff's testimony as well as the medical evidence and available medical opinions and testimony.   First, she considered that in February 2011, Plaintiff reported spending his days looking for jobs on the internet and performing odd jobs for the landlady.   [*Id.* at 52].   *See* [#13-

11 at 749].  He reported that he experiences panic attacks that affect his ability to concentrate, but he also described perseverance, "people skills," and a photographic memory as strengths. [#13-11 at 756, 757].  The ALJ noted that Plaintiff was previously successful in his work and had multiple financial rewards, and was seeking a consulting or executive position.  [#13-2 at 52].  In addition, Plaintiff drove himself to counseling and demonstrated an ability to keep appointments.  *See, e.g.,* [#13-11 at 778].  While Plaintiff testified he had trouble staying on topic and suffers protracted grief from his wife's death, the ALJ found no evidence in the record or during the three hearings that Plaintiff cannot stay on topic, and she noted that his wife died in 2010 and his alleged onset date is December 2007.  [*Id.*]  The ALJ also observed that Plaintiff's decision to have his daughter live with another family during a bed bug infestation of their camper demonstrated good judgment, and that Plaintiff had demonstrated the ability to look for work, find work, and also try to sell his product, even if without success.  [#13-2 at 31, 53].  *See* [#13-11 at 781].

In addition, most of Plaintiff's mental health records reflect diagnoses of adjustment disorder with depressed mood and anxiety.  *See* [#13-9 at 589-630; #13-11 at 748-768].  Plaintiff reported that he developed mental health symptoms in 2011, following his wife's death, and that he had experienced no mental health issues prior to that time.  [#13-11 at 778].  Following the death of his wife, Plaintiff nonetheless demonstrated an interest in and ability to start a business and move to California with his daughter for a job opportunity.  [#13-2 at 84-85; #13-12 at 973 ("I've been corresponding on linked in with a wildlife org and working on my res[ume]")].  *See also* [#13-9 at 596; #13-11 at 781 (reporting Plaintiff "said in 2012 he kept track and applied to over 4000 jobs")].  Plaintiff reported short-term memory impairments, stating he can only job hunt for four hours at a time before feeling fatigued [#13-11 at 779]; however, the ALJ observed

that Plaintiff, during a mental status exam, recalled three of three words immediately and three of three words after five minutes.   [#13-11 at 782, 783 (reporting that Plaintiff's ability to understand and comprehend simple language was adequate and his concentration and attention was adequate)].   In September 2012, he reported using a computer, writing, and studying about an hour day, caring for his pets and walking his dog, driving his daughter to school and helping her with her homework, grocery shopping, preparing meals daily, running short errands, and managing a check book. [#13-8 at 508-514]. The ALJ specifically found that "the physical and mental capabilities required in performing many of the household tasks…the claimant described replicate those necessary for obtaining and maintaining employment." [#13-2 at 54]. And, the ALJ observed that Plaintiff "appears very competent in his disability pursuit," on the basis that he visited multiple physicians and requested they complete certain paperwork, he is aware of the goings-on of his case, and he had demonstrated the ability to locate and exhaust local resources for housing and employment help. [*Id.* at 55]. *See* [#13-9 at 616].

The ALJ then considered the physicians' opinions in light of this medical evidence.  Dr. Pelc had served as an independent medical examiner during the third hearing and had testified that the record documents three psychiatric conditions: "affective disorder, major depression, or bereavement problem"; "anxiety/PTSD"; and "personality disorder NOS." [#13-2 at 62].  He further testified that Plaintiff's social functioning and concentration, persistence or pace appear moderately limited, citing Plaintiff's reports to doctors and his activities of life. [*Id.*]   In addition, he noted that Plaintiff's psychotropic medications are prescribed by Dr. Farley, not a psychiatrist, and are limited to Clonazepam and Trazadone. [*Id.*] The ALJ afforded great weight to Dr. Pelc's opinion because "he is an expert in the field, he examined all but the final 1-2 medical exhibits in the record, he explained the reasons for his opinions with reference to

specific medical signs and findings in the record, and his responses on cross-examination reinforced the persuasiveness of his conclusion." [#13-2 at 63].

Dr. Helvig, a consultative psychologist, evaluated Plaintiff in January 2013 and assessed his residual capabilities. *See* [13-11 at 778-785]. She diagnosed him with "mild, recurrent major depressive disorder, PTSD, anxiety disorder NOS, and personality disorder NOS with cluster B traits." [#13-2 at 64; #13-11 at 783]. Dr. Helvig observed that Plaintiff "appears adequate in his ability to concentrate, remember, and understand simple information," and that his persistence and pace "appear mainly limited by his depression, anxiety, PTSD, and interpersonal functioning." She opined that the "depression and anxiety symptoms will likely cause moderate interference with workplace and social abilities." [#13-11 at 783]. She also opined that Plaintiff could possibly perform independently in the competitive workplace, but "would do best in a job that required little interpersonal interaction." [*Id.*] The ALJ gave part of Dr. Helvig's assessment little weight because, "other than his personality disorder, there is little to no evidence that he would have significant trouble interacting at work." [#13-2 at 64]. The ALJ gave moderate to substantial weight to the rest of Dr. Helvig's opinion because she examined Plaintiff and "performed a medically acceptable assessment, she explained the bases for her opinions, and her conclusions are generally consistent with the evidence as a whole." [*Id.*]

Dr. Ryan, a non-examining expert source, evaluated the medical evidence from June 26, 2012 through January 22, 2013 for the SSI claim, and found Plaintiff's affective disorder, anxiety disorder, and personality disorder to be severe impairments under the regulations. *See* [#13-4 at 234-244, 245-258]. Dr. Ryan noted that Plaintiff could adequately concentrate, remember, and understand simple information, and that depression and anxiety symptoms may cause moderate interference with workplace and social abilities. [*Id.* at 242]. She assessed

Plaintiff as "not significantly limited to moderately limited" in mental functioning, and concluded that he is capable of work of limited complexity, but which required accuracy and attention to detail. [*Id.* at 240, 255]. She opined that Plaintiff can accept supervision and relate to coworkers and the public if contact is not frequent or prolonged. [*Id.*] Dr. Ryan concluded that the evidence in the file from December 14, 2007 through June 30, 2009 was insufficient to establish the presence of a mental disorder, and that the evidence in the file prior to the date last insured is insufficient. [*Id.* at 250]. The ALJ agreed with Dr. Ryan's assessment, and gave her evaluation substantial weight because she "is a highly qualified physician with knowledge of the rules and regulations regarding Social Security disability assessments who had the opportunity to evaluate all of the claimant's medical records to January 2013," and because the ALJ found Dr. Ryan's assessment consistent with the evidence of record. [#13-2 at 64].

The ALJ then compared the opinions of Dr. Pelc, Dr. Helvig, and Dr. Ryan with that of Ms. Goldhaber, who completed a mental impairment questionnaire for Plaintiff on October 22, 2013, after one month of treatment. *See* [#13-12 at 967-963; #13-13 at 1076-1082]. Ms. Goldhaber assessed Plaintiff as having extreme limitations in daily living, social functioning, and maintaining concentration, persistence or pace. She noted that Plaintiff had four or five episodes of decompensation in the past twelve months, but the ALJ noted Ms. Goldhaber indicated she understood decompensation, inaccurately, to mean period of "depressive symptoms."[7] [#13-2 at 65; #13-12 at 961]. Ms. Goldhaber assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 30-33, which the ALJ found was "sharply inconsistent with his level of

---

[7] "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

functioning," for example, his ability to ask and assist her in completing the form.[8]   [#13-2 at 65].   The ALJ was not persuaded by Ms. Goldhaber's evaluation and attributed it no weight in large part because of Plaintiff's self-reports of caring for his pets and for his daughter, assisting the owners of the land on which he parks his camper, appearing for appointments, and engaging in job searches.   [*Id.*]   The ALJ further noted that Ms. Goldhaber had treated Plaintiff for only one month at the time of the evaluation, she cited mental symptoms that "appear unduly based on what he told her," and she selected mental symptoms "such as incoherence, hallucinations, paranoid thinking, flight of ideas," that no other health care provider had noted or observed.   [*Id.*]

In sum, and contrary to Plaintiff's contention, I find that the ALJ considered all of his impairments, including his mental impairments, in formulating the RFC.   Plaintiff cites several record citations for support that his mental impairments are more severe than the ALJ recognized, but most of these citations are from Ms. Goldhaber's treatment records.   *See* [#17 at 56-57].   As the ALJ noted, however, Ms. Goldhaber observed Plaintiff for only one month, whereas Dr. Pelc and Dr. Helvig reviewed the entirety of Plaintiff's mental health treatment.   *See* [#13-2 at 63].   Again, the court will review the sufficiency of the evidence but will not reweigh it.   I find the RFC is adequately supported in the record.

## CONCLUSION

For the reasons set forth herein, the court hereby **AFFIRMS** the Commissioner's decision and **DISMISSES** this civil action, with each party to bear his and her own fees and costs.

---

[8] The GAF is a scale that assigns a score to reflect an individual's psychological, social, and occupational functioning. The scale is from 0 to 100, with a higher score indicating a higher level of functioning.   Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) at 34 (4th ed. Text Revision 2000).

DATED: February 13, 2017                    BY THE COURT:


                                            s/ Nina Y. Wang _____
                                            United States Magistrate Judge